803 F.2d 713
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Stanley Hodge, Appellant
v.
Hazel Reeves, Sheriff of Sumter County; Daniel R. McLeod,
Attorney General of the State of South Carolina,
Appellees.
Jessie McLeod, Appellant
v.
Hazel Reeves, Sheriff of Sumter County; Daniel R. McLeod,
Attorney General of the State of South Carolina, Appellees.
 No. 86-7538.
 No. 86-7539.
 United States Court of Appeals, Fourth Circuit.
 Argued May 6, 1986.
Decided Oct. 6, 1986.
 
 Before WIDENER, SPROUSE, and CHAPMAN, Circuit Judges.
 CHAPMAN, Circuit Judge.
 Lester L. Bates, III, and Samuel R. Haskell for Appellants; Donald J. Zelenka, Chief Deputy Attorney General (T. Travis Medlock, Attorney General on brief) for Appellees.
 CHAPMAN, Circuit Judge:
 
 
 1
 Stanley Hodge and Jessie McLeod were convicted in a joint trial in the Court of General Sessions for Sumter County, South Carolina, at which they were represented by the same attorney. They now attack their convictions under 28 U.S.C. Sec. 2254 (1982), and they raise the same question: "At what point in time must an objection to multiple representation be made in order to be deemed timely under Holloway v. Arkansas, 435 U.S. 475 (1978) and therefore trigger the "automatic reversal" rule?" We conclude that the timing of the objection to multiple representation is only one of the elements that must be considered under Holloway and that, upon the facts in the present case, there was no showing of a conflict between the interests of Stanley Hodge and Jessie McLeod while being represented by the same attorney in their joint state criminal trial. We affirm the district court in denying relief.
 
 
 2
 * On or about Thanksgiving Day 1980, Darryl Pierce, a juvenile, and one David Corbett, whose age is not reflected in the record, broke into the residence of Mr. and Mrs. William S. Heath. They took from the residence a sterling silver creamer and sugar dish, a considerable amount of flat silverware, other silver pieces, and some items of jewelry. The cream and sugar set was considered an antique and valued by the owner at $2500. The flat silver was valued at $16,000, and the other pieces were valued at $300. These stolen goods were stashed near the Heath home and later recovered by Pierce and Corbett. On the day after Thanksgiving, November 28, 1980, Corbett contacted two other juveniles, Greg Gregory and Henry Ardis, Jr., and asked them to assist in selling the silver. Several places were visited in an effort to dispose of the loot. The cream and sugar set was offered to Stanley Hodge on November 28, 1980, and bought on that date by Jessie McLeod.
 
 
 3
 Following an investigation, McLeod and Hodge were indicted as accessories after the fact of a felony, receiving stolen goods, and criminal conspiracy. They were represented at trial by the same counsel, C. C. Harness, III, of Summerton, South Carolina. McLeod was convicted on all three counts. Hodge was found guilty of accessory after the fact of a felony and criminal conspiracy, but he was found not guilty of receiving stolen goods. Each appealed to the South Carolina Supreme Court. Hodge's conviction as accessory after the fact of a felony was reversed, State v. Hodge, 278 S.C. 110, 292 S.E.2d 600, cert. denied, 459 U.S. 910 (1982). McLeod's conviction as accessory after the fact of a felony was reversed, State v. McLeod, 278 S.C. 112, 293 S.E.2d 699, cert. denied, 459 U.S. 910 (1982). The remaining convictions of both appellants were affirmed.
 
 
 4
 In 1980, Stanley Hodge owned Allsbrook's Grocery Store in Sumter. Jessie McLeod owned and operated a business known as G & M Music Company, which owned game machines and placed them in various locations, including Allsbrook's Grocery. In the late 1970s, as the price of gold and silver began to escalate, Hodge and McLeod began buying used gold and silver for resale. The prices they paid for these metals were based entirely upon the weight of the article. After they had accumulated a number of articles, they would either take them to Columbia, South Carolina, or send them to a dealer in the Midwest. At some time during 1979, McLeod and Hodge, together with one of Hodge's brothers, formed a partnership to buy and sell gold and silver. Each partner put up $10,000, and the venture was known as G & S Metals. No formal partnership agreement was ever executed, and apparently no books were kept, but there was a joint bank account with each partner having the right to draw upon the account. When G & S Metals began to do business, no license was required to buy gold and silver in Sumter. A license ordinance was passed about November 1980, but Hodge never obtained a license. McLeod's business was outside the city and not covered by the ordinance. McLeod testified that the business purchased between $150,000 and $200,000 of gold and silver during the year 1980 and that their advertising budget was between $7,000 and $8,000.
 
 
 5
 The Sumter police discovered the break-in of the Heath residence on the day following Thanksgiving. The Heaths were out of town, but they were contacted and returned immediately. Mr. Heath compiled a list of the valuables stolen from his home. The police reproduced this information and circulated it among purchasers of gold and silver in the Sumter area to alert them that such items might be offered for sale. These fliers were known as "hot sheets." Such a flier was distributed on Saturday after Thanksgiving to McLeod's business and on the following Monday to Hodge personally. McLeod denied that he ever saw the flier, and Hodge testified that he had no recollection of an officer bringing it to his store.
 
 
 6
 The police officers cracked the case as a result of leads developed about young males trying to sell silver to other dealers. Gregory, Pierce, and Ardis all gave statements to the police, and these statements led to the indictment of Hodge and McLeod. Gregory's statement was given December 9, 1980. He stated that he and Ardis had offered the cream and sugar set to the man at Allsbrook's who said he could not take it but directed him to a friend located on Highway 15 South. The silver set was left at Allsbrook's while Gregory ran an errand. When Gregory returned for the silver, he and Ardis met McLeod, who was the person that the man at Allsbrook's had mentioned. The man at Allsbrook's was Hodge. McLeod instructed Gregory and Ardis to follow him to his place of business, and there he purchased the cream and sugar set for $240. Later the same day, Gregory, Ardis, Corbett, and Pierce went back to McLeod's place and sold him" a pillowcase full of silver that had been stolen by Pierce and Corbett for $310. Pierce's statement indicated that he was not present when the silver cream and sugar set was offered to Hodge and later sold to McLeod, but he did go on the second trip to McLeod's place to sell the pillowcase full of flat silver.
 
 
 7
 Ardis' statement was given December 9, 1980, and revealed that a month earlier Corbett, Gregory, and he had sold rings and some silver at Allsbrook's grocery. He did not say whether these items were stolen. He stated that on a Thursday night Corbett called him and asked him to sell some silver on the following day. He and Corbett went to Pierce's house where Pierce handed them a pillowcase containing silver. They went to Copeland's, a business in Sumter, but could not make the sale because they had no identification. They went to Allsbrook's, and Gregory went in. He came out and reported that the man inside lacked cash to buy the silver but would keep it until they returned later to pick up the money for the silver. When they returned for the money, Gregory advised that they were going to follow a man (McLeod) to another store on Highway 15. They went to McLeod's place, and he paid Gregory for the silver.
 
 
 8
 On December 11, 1980, arrest warrants were issued for McLeod and Hodge. Before they were indicted, they retained C. C. Harness, III, to represent them jointly. Prior to indictment, a preliminary hearing was held at which Harness appeared for both. Shortly after he became counsel, Harness received copies of the statements of Gregory, Pierce, and Ardis. The indictment was returned on March 2, 1981. Harness obtained a continuance, and the case was tried in June 1981. At the commencement of the trial, there were two attorneys sitting at the defense table. In addition to Harness, there was T. H. Davis, III, and the trial judge asked if Davis represented McLeod. Davis replied that he was "just amicus," but he was apparently assisting Harness in selecting the jury since Harness was not from Sumter County. The record does not show how long Harness remained at the defense table, but he was there at the time of the first motion for a mistrial.
 
 
 9
 Harness realized that there were certain inconsistencies in the statements of the juveniles and moved that the witnesses be sequestered. This motion was granted. Harness did not indicate that any such inconsistency would produce a conflict between his two clients. In his opening statement he advised the jury that his clients were legitimate gold and silver dealers and that they cooperated with the police.
 
 
 10
 The first witness called was Mr. Heath, and he testified as to the items stolen from his home and their value. The second witness was Darryl Pierce, and he explained the break-in and the theft of silver. He testified that Corbett was with him and that Corbett would arrange with Gregory and Ardis to sell the silver. He thought that the sale was about four days after the theft. Pierce testified that he accompanied Gregory and Ardis to a store on Broad Street where they attempted unsuccessfully to sell the cream and sugar set. Thereafter, he stated that Gregory and Ardis retained the cream and sugar set and returned to him the rest of the stolen silver. Later, Gregory and Ardis advised Pierce that they had sold the set and thought they could sell the rest of the silver. They went to Allsbrook's Grocery and then to a place on Highway 15 South, where Gregory and Ardis went in with the pillowcase of silver while pierce stayed in the track. Later they came out and divided certain cash.
 
 
 11
 The third witness was Greg Gregory, who testified that he was sixteen years of age and knew both Hodge and McLeod. He related that Pierce telephoned him and asked him to sell some silver. When he and Ardis picked up Pierce, he had the cream and sugar set. They drove to Copeland's on Broad Street where Ardis tried unsuccessfully to sell the set, and they then went to Allsbrook's Grocery where he had previously sold silver. Pierce did not accompany them to Allsbrook's Grocery, and he was not sure whether Ardis went into the store with him. Gregory testified that Hodge tested the two silver pieces and advised that they were worth $240. Hodge did not have enough money to buy the silver, and he did not want to have any trouble with the law. Hodge advised that he had to go to the bank and would be back around 12:30 p.m. Gregory said Hodge told him he would buy the pieces, and Gregory decided to leave the cream and sugar set with Hodge while Gregory ran an errand of picking up some bricks. Later the same day, when he returned to Hodge's Grocery Store, Hodge advised him that he could not buy the set. At this time Jessie McLeod was in the grocery store, and Hodge told Gregory to go with McLeod, and McLeod would buy the silver. Gregory went with McLeod to his store on Highway 15 South and sold the cream and sugar set to McLeod for $240. Thereafter, Gregory returned to Pierce's home and picked up Pierce and Corbett together with a pillowcase of silver forks and spoons. They drove back to McLeod's place and Gregory alone went in to sell the flat silver. Gregory testified that McLeod asked him how long the silver had been stolen, and he advised about three or four days. He asked for $400, but McLeod would pay only $310. Both Gregory and Pierce admitted that they had entered pleas of guilty in the family court as a result of their part in the theft and sale of the silver.
 
 
 12
 After Gregory's testimony was completed, there was a short recess. During the recess it appears that the trial judge, Ernest Finney, Jr. (now a member of the South Carolina Supreme Court), acting sua sponte spoke to Attorney Harness and the prosecutor about a possible conflict because Harness was representing both defendants, but there is no record of this conversation. Following the recess, Judge Finney asked Attorney Harness if he wished to place a motion on the record, and Harness responded:
 
 
 13
 I would like to put on the record that I would like to make a motion for a mistrial at this point due to the testimony of the last witness on the stand. It appears to me that I may have some conflict with representing both gentlemen in this case. I would respectfully request that the Court grant us a mistrial so that we would have an opportunity to get a second counsel in to represent either one of the parties and to be sure that justice is done in this case.
 
 
 14
 Judge Finney asked the prosecutor his position. The prosecutor opposed the motion and pointed out that Attorney Harness had received the statements of the juvenile witnesses some five months before trial and was well aware in advance of trial as to what this testimony would be. Attorney Harness stated that he observed some conflicts in the statements and that he had considered the matter "long and hard" before trial, but that it appeared to him that he had no conflict in representing the two defendants. Harness never explained what conflict between his clients had been created by Gregory's testimony. Judge Finney denied the motion for a mistrial, subject to a possible change in his ruling after he had read the statements of the juveniles that were made available to the defense long prior to trial. At this point, the judge noted that Attorney Davis was still sitting at defense table and that he had consulted with Harness during the course of the trial. Davis responded that he was present only to help select the jury. The judge stated that he would appreciate it if the attorney would remain during the course of the trial, but the record does not show whether he remained in the courtroom. He did not participate in the questioning of witnesses or oral argument.
 
 
 15
 The state also put up investigators from the Sumter County Sheriff's Department who testified about the delivery of the fliers describing the stolen silver to both defendants' places of business and about the efforts made to recover the silver by notifying local businesses of the theft and the description of the property.
 
 
 16
 At the conclusion of the state's case, Attorney Harness renewed his motion for a mistrial because of "the potential conflict" and stated:
 
 
 17
 I believe that some of the testimony that came before the bar today would give me reason to believe that there may be a conflict in the representation of both gentlemen, particularly with reference to the testimony of the young men that came before the bar, and I would respectfully move, as I have previously and on those same grounds, that a mistrial be granted.
 
 Judge Finney denied the motion and stated:
 
 18
 I would respectfully deny the motion feeling that there is ample evidence, particularly after reviewing the statement, that would indicate that there is sufficient evidence to submit the matter to the triers of . . . fact and that any potential conflict was known prior to the institution of these proceedings and the selection and swearing of the Jury.
 
 
 19
 Both defendants were called as witnesses for the defense. Defendants also called a deputy sheriff and a police officer to attest that both defendants had cooperated with police in the past.
 
 
 20
 Hodge testified that he owned and operated Allsbrook's Grocery and that in 1979 he began buying gold and silver as a sideline. He received daily quotes from a business in Ohio. He stated he had put up a sign in his store advising that he did not want to purchase stolen goods. However, he admitted he had no way of knowing whether articles presented to him were stolen and that he could not ask everyone who came in if the articles offered to him were stolen. He then explained that he and his brother Robert Hodge joined with McLeod in forming a metals business with each putting up $10,000. He testified that they spent between $7,000 and $11,000 in advertising the metals business in 1980. He also admitted that on several occasions police had come by to recover items from him that he had bought which turned out to be stolen property; he stated that this occurred between twelve and twenty times in 1980 and involved approximately $2,000. He stated that the partnership was dissolved about July or August 1980.
 
 
 21
 Hodge stated that on the day after Thanksgiving 1980, he saw witness Gregory who wanted to sell a creamer and another bowl. He stated that this was the first person to offer him silver in about a week. He advised Gregory that he was no longer buying silver because he had no license, but Gregory kept insisting that he buy the pieces. Hodge finally stated that he did not have the money at the time, but if Gregory wanted to come back, Hodge would buy it. Gregory left the silver with Hodge for an hour or two, and when he returned, Hodge stated he told Gregory that he had thought it over and would not buy the silver because he did not have a license. He told Gregory that someone in the county might buy the silver, and about that time defendant McLeod walked into the store. Hodge testified that he told McLeod that Gregory had some silver and that he wanted $240 for it. Shortly thereafter, Gregory and McLeod left Hodge's store.
 
 
 22
 Hodge stated that he had not asked Gregory his age because he appeared to be as old and as large as Hodge. He finally stated, "I didn't care how old he was." Hodge stated that he had no recollection of seeing the "hot sheet" about the items of silver stolen from the Heath home. He admitted that police brought these sheets by his business quite frequently and that if the information about the Heath silver had been delivered to him, he had no cause to look at it because he was not buying silver at the time. He stated that he sold 95 percent of what he bought to an outlet in Ohio and that he never asked people how they acquired the silver offered to him. Hodge stated that he was not interested in the craftmanship of any silver object but only in the weight of the silver. He stated that the reason he put up the sign about not buying stolen goods was to prevent him from having to ask people if they had stolen the silver offered to him. At the time of trial, Hodge said that he was still in the business of purchasing gold and silver but that he had not made any purchases recently.
 
 
 23
 McLeod testified that he had bought gold and silver for about ten years as a hobby but began buying it as a business in January 1979. His testimony about the partnership with Stanley Hodge and Robbie Hodge was the same as that given by defendant Hodge. His testimony as to the total amount purchased and the advertising expenses was also consistent with Hodge's testimony. He testified that he was in Hodge's store almost every day.
 
 
 24
 McLeod recalled dealing with Gregory and thought that he was in his late twenties. He stated that he did not buy silver from teenagers but admitted that he did not ask Gregory for any identification. He stated that he was not called by Hodge to come to Allsbrook's Grocery on the date of the purchase but merely went by there because he had nothing else to do. McLeod stated that he advised Gregory to come out to his place on Highway 15 South and he might buy the silver. Gregory followed McLeod to McLeod's store, and McLeod finally purchased the cream and sugar set for $240. He stated that he took the silver to Columbia the same afternoon and sold it along with other items he had previously purchased. McLeod denied that he had personally received a "hot sheet" flier from a police officer.
 
 
 25
 McLeod stated that he had no receipt from Gregory to evidence the purchase and that he did not usually give receipts. McLeod testified that Hodge had nothing to do with the purchase of the silver from Gregory, that they did not buy it together, but that McLeod bought it alone. He stated he never made it a point to find out what gold and silver items had been stolen unless the police visited him or telephoned him.
 
 
 26
 At the conclusion of McLeod's testimony, the defense rested and Attorney Harness renewed his motion for a mistrial:
 
 
 27
 I'd like to reiterate my motion for mistrial based upon the grounds that there was a conflict. Now that all the evidence has come out, there is evidence that there was conflict. I realize earlier that you ruled that I should have had knowledge, but it was a surprise to me when the evidence came forward.
 
 
 28
 Harness did not identify what evidence revealed to him the existence of a conflict. In denying the motion, Judge Finney stated:
 
 
 29
 Mr. Harness, as I perceive the evidence at this point, both of the Defendants have taken the stand and they have told, for all practical purposes, related the identical set of facts. I, therefore, would respecfully deny your motion. I think Mr. Hodge testified that he didn't buy it. The witness Mr. Gregory testified that Mr. Hodge didn't buy it; but Mr. McLeod testified and indicated during his testimony that he [McLeod] did in fact make the purchase.
 
 
 30
 The judge denied motions for a directed verdict of acquittal. After the arguments and charge, the jury returned verdicts acquitting Hodge of receiving stolen goods but finding him guilty of conspiracy and as an accessory after the fact of a felony. McLeod was convicted on all three counts.
 
 
 31
 A motion for a new trial was made and also a motion to be relieved as counsel on appeal. Judge Finney responded:
 
 
 32
 I will note your motion to be relieved as counsel, but I do not think that I have the authority at this juncture to relieve you on the basis which you have inserted into the record. The Court, in an abundance of caution, very early in these proceedings when the first or second State's witness testified, admonished counsel that there may be a potential conflict developing and subsequent thereto did in fact rule that there was no conflict, otherwise we would have declared a mistrial because the testimony, as it developed from the State's witnesses and from the two Defendants, all indicated in substance the same circumstances upon which the Court felt that there may have been a conflict.
 
 
 33
 Now we recognize fully that both of the Defendants took different positions with regard to the State's case as far as their knowledge concerning the goods and whether they were stolen. That is not the basis of my feeling that there was a potential conflict. My feelings on the potential conflict had to do with the testimony of the witness, Mr. Gregory, which indicated that Mr. Hodge may not have had anything to do with receiving the goods. My review of the notes later indicated to me that Mr. Gregory did say that Mr. Hodge received the goods for only a very short time. Mr. Hodge's testimony was somewhere between five and forty-five minutes and indeed Mr. Hodge himself admitted that he did come into possession of these goods; and of course, the Jury has, by its verdict, found Mr. Hodge not guilty of that charge . . .
 
 
 34
 On appeal to the Supreme Court of South Carolina, both Hodge and McLeod briefed the issue of conflict of counsel, but in neither opinion did the South Carolina Supreme Court mention this exception.
 
 II
 
 35
 Harness now claims that a conflict was created because he was surprised by the testimony of Gregory which indicated that Hodge was more deeply involved in the crime than his earlier statement indicated. However, this did not create a conflict between Hodge and McLeod. Hodge's deeper involvement in the crime under Gregory's testimony was his agreement to buy the silver after he had obtained the necessary funds from the bank and that the silver was left in Hodge's possession. Hodge admitted that the silver was left in his possession, and this did not create a conflict. McLeod was not present at the first meeting of Hodge and Gregory so he did not testify as to Hodge's possession of the silver, but he did testify that McLeod alone purchased the silver and that Hodge had no part in the purchase. More importantly, neither Hodge nor McLeod implicated each other. Each denied any wrong doing, and neither tried to place any responsibility upon the other.
 
 
 36
 Appellants contend that this case is governed by the "automatic reversal" rule of Holloway v. Arkansas, 435 U.S. 475 (1978), and Cuyler v. Sullivan, 446 U.S. 335 (1980), and that the only issue is whether the objection to multiple representation in the present case was "timely," because it was made after the third witness for the state testified and was raised sua sponte by the court. They also contend that the trial court made no inquiry into the possible conflict of interest as required by Holloway.
 
 
 37
 First, the trial judge, contrary to appellant's assertions, did make an inquiry into the potential for conflict by the joint representation of Hodge and McLeod. This inquiry was sua sponte by the court and raised the question of a potential conflict. This potential conflict never ripened into an actual conflict, and Harness' claim that Gregory's testimony involved Hodge more than Harness had originally expected did not create a conflict between Hodge and McLeod. Holloway holds that a defendant in a joint representation case is not required to show prejudice, but there must be a showing of conflict between the positions of the jointly represented defendants. There has been no showing before the state court, the United States District Court, or this court as to the nature of the conflict between Hodge and McLeod. The trial judge thought there might be a conflict as to whether Hodge ever had possession of the stolen goods, but Hodge finally admitted this point, and in spite of his admission, he was acquitted on this charge.
 
 
 38
 Holloway expanded the Court's holding in Glasser v. United States, 315 U.S. 60 (1942), by finding that there did not have to be a showing of prejudice, but the Court did not adopt a per se rule that joint representation created a conflict. It reiterated the finding in Glasser:
 
 
 39
 One principle applicable here emerges from Glasser without ambiguity. Requiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not per se violative of constitutional guarantees of effective assistance of counsel. This principle recognizes that in some cases multiple defendants can appropriately be represented by one attorney; indeed, in some cases, certain advantages might accrue from joint representation. In Mr. Justice Frankfurter's view: "Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack." Glasser v. United States, supra, at 92 (dissenting opinion).
 
 
 40
 Holloway, 435 U.S. at 482 and 483.
 
 
 41
 The present case is the type of joint representation referred to by Justice Frankfurter. McLeod and Hodge both told the same story, both took the position that they did not deal in stolen goods and that if the silver presented to them by Gregory, Pierce and others was stolen, they were not aware of this fact. Neither tried to place the blame on the other.
 
 
 42
 In Cuyler v. Sullivan, Justice Powell explained the Holloway decision:
 
 
 43
 Holloway requires state trial courts to investigate timely objections to multiple representation. But nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case. Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer or his clients knowingly accept such risk of conflict as may exist. Indeed as the Court noted in Holloway, supra, at 485-486, trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel. "An 'attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial."' 435 U.S. at 485, at 485, quoting State v. Davis, 110 Ariz. 29, 31, 514 P.2d 1025, 1027 (1973). Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.
 
 
 44
 446 U.S. at 346-347.
 
 
 45
 In the present case Judge Finney sua sponte raised the potential of a conflict and then satisfied himself that an actual conflict did not exist.
 
 Justice Powell further explained:
 
 46
 Holloway reaffirmed that multiple representation does not violate the Sixth Amendment unless it gives rise to a conflict of interest. See 435 U.S., at 482. Since a possible conflict inheres in almost every instance of multiple representation, a defendant who objects to multiple representation must have the opportunity to show that potential conflicts impermissibly imperil his right to a fair trial. But unless the trial court fails to afford such an opportunity, a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel. Such a presumption would preclude multiple representation even in cases where "'[a] common defense . . . gives strength against a common attack."' Id., at 482-483, quoting Glasser v. United States, 315 U.S. 60, 92 (1942) (Frankfurter, J., dissenting).
 
 
 47
 446 U.S. at 348.
 
 
 48
 In the present case, although the defendants did not object to common representation until the issue was raised by the trial judge, they were given the opportunity to show that potential conflicts imperiled their right to a fair trial, but no showing was made to the trial court, and no showing has been made since that time. This appears to be a good example of added strength by use of a common defense and avoiding "reciprocal recrimination."
 
 
 49
 The state trial judge did all that was required of him to insure that there was not a conflict of interest in the joint representation of McLeod and Hodge. There was no conflict and their sixth amendment rights were in no way violated by the use of a single attorney in their trial. The question as framed and presented by the appellants presupposes a conflict resulting from their joint representation by the same attorney; however, since there was no conflict, the timing of an objection is not material.
 
 
 50
 AFFIRMED.